UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANCINE COLE,<br><br>   Plaintiff,<br><br>v.<br><br>TOWN OF MORRISTOWN, FORMER MAYOR DONALD CRESITELO, MAYOR TIM DOUGHERTY (individually and in their capacity as Employees of the Town of Morristown), MORRISTOWN POLICE DEPARTMENT, MATHEW EDWARDS, THEODORE JONES, ERIC PETR, VALDAR CHAUDRUC, CLARENCE SOFIELD, DEANNA DIETRICH (all individually and in their capacity as Employees of the Morristown Police Department), POLICE CHIEF PETER DEMNITZ (Individually and in his capacity of Chief of Police ), MR. JEFF HARTKE (individually and in his position as the Director of the Morristown Department of Public Works), RICK WISE (individually and in his position as Supervisor of the Morristown Department of Public Works' Clinton Street Garage), JOHN FUGGER individually and in his capacity as Zoning Officer of the Town of Morristown Zoning Department), ST.CLARE'S HOSPITAL, SUMAN L. JALAN, GARY BRENNAN, KIM TELLING (all individually and in their capacity as Employees, agents and/or Independent Contractors of St. Clare's Hospital), DAVID COLE, ANDREA COLE-CAMEL and JOHN DOES 1-15,<br><br>   Defendants. | Civil Action Number:<br>2:10-cv-04706 (WJM)<br><br>OPINION |

1

**WILLIAM J. MARTINI, U.S.D.J.**

Plaintiff Francine Cole brings federal and state claims against the Town of Morristown, Morristown Police Department, and employees of both entities, ("Morristown Defendants"), St. Clare's Hospital and several of its employees ("St. Clare's Defendants"), and two of her siblings, David Cole and Andrea Cole-Camel. The Morristown Defendants and the St. Clare's Defendants move for summary judgment. For the reasons set forth below, these motions are **GRANTED**.

## I.     FACTUAL BACKGROUND

Plaintiff is a 57-year-old African-American woman. (*See* Plaintiff's Cross-Statement of Material Facts in Response to Morristown's Statement of Facts ("Cross-SOF to Morristown's SOF") at ¶ 1.) At the relevant times, Plaintiff resided at 21 Liberty Street in Morristown, New Jersey. At the time, the property belonged to the Estate of Annie Cole. (Cross-SOF to Morristown's SOF at ¶ 3.) Francine Cole had an ownership interest in the Estate of Annie Cole. (*Id.*)

Between February 18 and February 20, 2009, Morristown police were called four times to 21 Liberty Street. (*See* St. Clare's Statement of Facts ("St. Clare's SOF") at ¶¶ 3-4; Plaintiff's Cross-Statement of Facts in Response to St. Clare's SOF ("Cross-SOF to St. Clare's SOF") at ¶ 4.)

### A. First Incident

The first call occurred on the evening of February 18, 2009. (St. Clare's Exhibit C.) Plaintiff complained to Officers Tissot, O'Grady, and LaBarre that she wanted her two grand-nephews, Joseph Cole and George Johnson, both in their late teens or early twenties, removed from the second story of her residence. (Cross-SOF to Morristown's SOF at ¶ 1.) The police were aware that her nephews had juvenile criminal records for dealing drugs. (Cross-SOF to Morristown's SOF at ¶ 6.) Mr. Cole and Mr. Johnson had been staying at 21 Liberty Street for approximately six days awaiting the settlement from a life insurance policy. (St. Clare's Exhibit C.) Plaintiff claimed that the nephews were actually living with a neighbor, Lillie Ruth Crew, and that Plaintiff had only invited them to stay at 21 Liberty Street "intermittently for a day or two as invited guests." (Cross-SOF to Morristown's SOF at ¶ 1.) Plaintiff advised police that the nephews disrespected her and did not comply with simple requests. (St. Clare's Exhibit C.) The nephews and Plaintiff had gotten into a dispute, and Plaintiff asked the nephews to leave. (*Id.*)

2

After the nephews refused to leave, Plaintiff called the police. (*Id.*) The police spoke with the parties involved, and all agreed that that the nephews would stay one more night and then make alternative sleeping arrangements. (*Id.*)

### B. Second Incident

On February 19, 2009, Officer Petr arrived at 21 Liberty Street to the report of a dispute. (Morristown's Exhibit 1.) Plaintiff complained that her nephews should not be there and that their friend Derrick was trespassing. (*Id.*)

Joseph Cole told Officer Petr that he and George Johnson had been living in the house for the past week with the permission of their Aunt, Defendant Andrea Cole-Camel, whom he claimed was the majority owner of the house. (Morristown's SOF at ¶¶ 4-5.) Mr. Cole told these police officers that he and Mr. Johnson had been planning to go to South Carolina on February 18, 2009, but they had to stay in New Jersey until a final settlement was reached regarding the life insurance policy of a deceased aunt. (Morristown's SOF at ¶ 4.) Plaintiff states that police never told her about her nephews' claims that their Aunt Andrea gave them permission to stay there and that Andrea actually held no interest in the property. (Cross-SOF to Morristown's SOF at ¶ 5.)

Officers Petr and Dietrich determined that Plaintiff's complaint was a landlord/tenant dispute. (Morristown's Exhibit 1.) When the police explained to Plaintiff the proper procedure for evicting tenants via the court, she accused the Morristown Police Department of allowing drug dealers to live in her home, of being prejudiced against her and her family, and allowing drug dealers to live and sell drugs on Mount Airy Road. (Morristown's SOF at ¶ 13.) At times during her interaction with the police, Plaintiff recited Psalm 91, which states, "Because thou hast made the Lord, which is my refuge, even the most High, thy habitation; There shall no evil befall thee, neither shall any plague come nigh thy dwelling." (Cross-SOF to Morristown's SOF at ¶ 14.)

### C. Third Incident

Police were called to 21 Liberty Street for the third time at approximately 7:19 AM on February 20, 2009. (Morristown's Exhibit 1.) Plaintiff told a dispatcher that George Johnson threw water at her while she was praying inside the home. (Cross-SOF to Morristown's SOF at ¶ 19.) Officers Chaudruc and Summers responded to the call. (St. Clare's Exhibit D.)

3

When police asked George Johnson to explain his version of what happened, he stated that he had been sleeping upstairs when he heard Plaintiff start yelling, "God please remove the evil men from this house, remove their evil spirits." (Morristown's SOF at ¶ 20.)  He denied throwing anything at her and said she was "just crazy."  (Morristown's SOF at ¶ 20.)  Plaintiff denied being injured by the alleged assault.  (St. Clare's Exhibit D.)

In addition to the assault with water, Plaintiff also reported chest pains that morning.  (St. Clare's Exhibit D; Morristown's SOF at ¶ 17.)  Plaintiff told police that the pain was not related to her heart, but was muscular strain from moving a mattress down the stairs.  (Cross-SOF to Morristown's SOF at ¶ 18.)  EMS arrived at the scene, but Plaintiff would not allow them to take her blood pressure, and she refused all medical treatment.  (Morristown's SOF at ¶ 19.)  Police again advised Plaintiff of the procedures for evicting tenants, but they felt uncertain that she would respond based upon her expressed distrust of the police and the courts.  (St. Clare's Exhibit D.)

### D.  Fourth Incident

Less than 12 hours later, police received another call to report to 21 Liberty Street.  (Morristown's SOF at ¶ 23.)  Officer Chaudruc responded to Plaintiff's complaint that her nephews were stomping on the floor in the upstairs apartment.  (Morristown's SOF at ¶ 24.)  Plaintiff presented an audio recording of the alleged stomping to police.  (Morristown's SOF at ¶ 25.)  The recording contained nothing but sounds of Plaintiff talking and moving around.  (Morristown's SOF at ¶ 26; Cross-SOF to Morristown's SOF at ¶ 25.)

The nephews told the police that Plaintiff had turned off the hot water while they were in the shower.  The nephews also told them that they knew Plaintiff had been treated for mental health issues before but that they had "never seen her this bad."  (Morristown's SOF at ¶¶ 30-31.)

At this point, officers on the scene contacted St. Clare's Hospital regarding a possible mental health screening of Plaintiff.  (Morristown's SOF at ¶ 22.)  The officer reported that Plaintiff had called the police several times over the course of a short time span, had refused medical treatment for chest pain, was behaving irrationally, and expressed a belief that there was a conspiracy of police, the courts, and her family against her.  (Morristown's SOF at ¶ 34; St. Clare's SOF at ¶ 8.)

St. Clare's sent two mental health screeners, Gary Brennan and Kim Telling to 21 Liberty Street. (St. Clare's SOF at ¶ 11.) At some point, Plaintiff's brother and sister, David Cole and Zandra Morgan, also arrived on the scene. (Morristown's Exhibit 1; St. Clare's Exhibit L.)

Ms. Telling went upstairs to speak with the nephews and the sister. (St. Clare's SOF at ¶¶ 11, 18; St. Clare's Exhibit L.) The nephews complained that Plaintiff had been beating on the door of the nephews' apartment with a stick and that when they would not open the door, she had had been throwing "holy water" at them. (St. Clare's SOF at ¶ 20.) The nephews and sister reported that Plaintiff had a history of aggressive behavior, including "going after her sister with a baseball bat." (St. Clare's SOF at ¶ 19; St. Clare's Exhibit L.) Plaintiff's family members also noted that Plaintiff had a history of threatening to hurt herself and a history of hospitalizations "down south." (St. Clare's Exhibit L.) Plaintiff denied any history of aggressive behavior or mental illness. (Cross-SOF to St. Clare's SOF at ¶ 18.)

The mental health screeners noted that Plaintiff presented with pressured speech and fixed paranoid delusional thoughts, including believing that her family, the government, her nephews, and hospitals were against her. (St. Clare's SOF at ¶ 19.) The mental health screeners were particularly concerned about Plaintiff's refusal to have her blood pressure taken. (St. Clare's SOF at ¶ 21.) The mental health screener's form concluded, "Patient is in need of further psychiatric treatment and stabilization in a hospital setting due to increased symptoms of psychosis, bizarre and impulsive behaviors that are resulting in patient being a danger to herself and others at this time." (St. Clare's Exhibit L.)

Plaintiff agreed to be transported to St. Clare's Hospital voluntarily, although she stated that she did so in the belief that police officers "are always looking to shoot somebody black." (St. Clare's SOF at ¶ 27.) She was allowed to call her attorney and to make arrangements for the care of her pets before going. (St. Clare's SOF at ¶ 24; St. Clare's Exhibit F.)

At the hospital, a psychiatrist performed an evaluation. (St. Clare's SOF at ¶ 34.) The psychiatrist concluded that Plaintiff was suffering from adjustment disorder with mixed emotional features. (St. Clare's SOF at ¶ 34.) The psychiatrist recommended an out-patient treatment program she thought might help Ms. Cole deal with the various stressors that were affecting her. (St. Clare's SOF at ¶ 35.) Plaintiff was free to reject that recommendation. (St. Clare's SOF at ¶ 36.) Plaintiff was discharged from the hospital after six hours. (St. Clare's SOF at ¶ 37.)

## II. PROCEDURAL HISTORY

On September 14, 2010, Plaintiff filed a nine-count Complaint against Defendants. On July 31, 2011, the court dismissed parts of the Complaint for failure to state a claim. Remaining were the following counts and claims:

(1) Count 1, alleging false arrest.

(2) Count 2, alleging violations of various constitutional rights under 42. U.S.C. § 1983 against all Defendants except the Town of Morristown, and against Town employees in their individual capacities only.

(3) Count 3, alleging a conspiracy to violate Plaintiff's constitutional rights under 42 U.S.C. § 1985 against all Defendants, except the Town of Morristown, and against Town employees in their individual capacities only.

(4) Count 4, alleging liability for a failure to stop or rectify the violation of Plaintiff's constitutional rights under 42 U.S.C. § 1986 against all Defendants, except the Town of Morristown, and against Town employees in their individual capacities only.[1]

(5) Count 6, alleging assault and battery against all Defendants except Cresitello, Demnitz, Dougherty, Hartke, and Wise (the Morristown Defendants who were not personally involved in Ms. Cole's ordeal).

(6) Count 8, alleging violations of state constitutional rights under the New Jersey Civil Rights Act.

(7) Count 9, alleging violations of the Americans with Disabilities Act.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that

---

[1] The basis for this dismissal of the Town of Morristown from the 1983, 1985, and 1986 causes of action was Plaintiff's failure to allege a "policy or custom of the government entity which deprived Plaintiff of her rights. *Monell v. Dep't Social Servs. of City of N.Y.*, 436 U.S. 658 (1978)." Based on this reasoning, the court dismissed the Morristown Police Department along with the Town of Morristown.

6

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

### III. DISCUSSION

#### A. State Law Claims

New Jersey has a statutory scheme to facilitate the identification and treatment of mentally ill people who may be a threat to themselves or others. N.J.S.A. § 30:4-27, *et seq*. Defendants argue that Plaintiff's claims are barred by the statutory immunity conferred under N.J.S.A. § 30:4-27.7 to those engaged in a mental health assessment:

> A Law Enforcement Officer, screening service or short-term care facility designated staff person or their respective employers, acting in good faith pursuant to this act who takes reasonable steps to assess, take custody of, detain or transport an individual for purposes of mental health assessment or treatment is immune from civil and criminal liability.

N.J.S.A. § 30:4-27.7(a).

Plaintiff does not dispute that this statute bars suits sounding in state law. Moreover, Plaintiff has presented no evidence that the Defendants acted in bad faith when they decided to administer a mental health screening and transport Plaintiff for further assessment by a psychiatrist. Therefore, the court will dismiss Counts 1 (false arrest), 6 (assault and battery), and 8 (New Jersey Civil Rights Act).

#### B. Federal Claims

The remaining counts of Plaintiff's Complaint involve Plaintiff's central theory that the Defendants are liable for civil rights violations under (1) 42 U.S.C.

7

§§ 1983, 1985, and 1986 and (2) Title II of the Americans with Disability Act. Plaintiff's Section 1983, 1985, and 1986 claims rest upon alleged violations of her First, Fifth, and Fourteenth Amendment rights to be free from racial and religious discrimination. She also claims Defendants violated her Fourth Amendment right to be free from unreasonable searches or seizures. The ADA claims allege deprivation from the services of a public entity on the basis of disability.

Qualified immunity bars the suit against the Morristown Defendants who are Town employees ("Morristown Employees"). The Plaintiff has also failed to bring forth evidence to support any of the federal causes of action against any of the remaining Defendants.

### 1.  *Qualified Immunity of Morristown Employees*

Under the theory of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

Qualified immunity encompasses mistaken judgments that are not plainly incompetent. *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). In determining whether a right has been clearly established, its contours must be sufficiently clear so that a "reasonably competent officer" would have understood that he was violating a clearly established right. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Whether an officer is thus entitled to qualified immunity is a question of law that is properly answered by the court. *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007).

In this case, Plaintiff argues that the constitutional and statutory violations took the form of (1) failing to investigate the complaints she phoned into the police department, (2) calling for the assistance of mental health screeners in bad faith, (3) illegal search and seizure. Plaintiff has brought forth no allegations tending to show that the Morristown Employees' investigations, call for assistance of mental health screeners, or any other conduct violated any of Plaintiff's clearly established rights to be from discrimination or illegal searches or seizures.

The thrust of Plaintiff's argument regarding the failure to investigate theory is that police did not resolve the ambiguities on the scene in her favor. For example,

she complains that the police did not react to her story that the nephews were trespassers by removing them. (Cross-SOF to Morristown's SOF at ¶ 1); that the police did not take action when she complained that the nephews were drug dealers; (*Id.* ¶ 6) that they did not listen to her when she told them her chest pains were just muscle strain (*Id.* at ¶ 34); that they credited her family members' stories about her mental health history without asking her for verification (Cross-SOF to St. Clare's SOF at ¶ 18). Plaintiff cites no law demonstrating that the behaviors of which Plaintiff complains constitute a clearly established legal violation of which a reasonable officer would have known.

The failure to remove the nephews for being convicted drug dealers is not evidence of a failure to investigate. Plaintiff did not allege that she was witnessing drug dealing on the premises.

No evidence demonstrates that the police request for the mental health screening was improper. Plaintiff's family members reported a history of mental illness. Plaintiff had exhibited or was reported to have engaged in various irrational behaviors over the course of the four visits to her home. These included: (1) making four calls to the police about non-emergencies, (2) being unable to handle simple domestic discord with her nephews without police intervention, (3) making phone calls to have police remove her nephews even after police gave her instructions for filing an eviction proceeding, (4) making alarming complaints about "chest pain" and then refusing basic medical precautions, (5) paranoid expressions about conspiracies against her, (6) possibly turning off the hot water while her nephews were showering, (7) possibly having a psychotic delusion of George Johnson throwing water on her, (8) possibly using prayers to intimidate her nephews, (9) presenting police with an audio recording of "stomping" which contained no audible stomping on it, (10) repeated utterances of religious verses about evil in the home. While no individual act in isolation may have been of concern, the sum total of her irrational behaviors, in addition to her family's reports of mental illness warranted the police consultation with mental health experts.

The police activities in her home do not demonstrate any violations of rights to be free from unreasonable searches or seizures. Plaintiff consented to police entry into her home and to transport to St. Clare's. The limited investigation of the residence was reasonable under the circumstances. *See Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006) (the "ultimate touchstone" of the Fourth Amendment is "reasonableness").

Because plaintiff has presented no evidence to overcome the qualified immunity defense, the Complaint must be dismissed against the Morristown Employees.[2]

### 2.  *1983, 1985, and 1986 Claims*

Plaintiff seeks damages from the Defendants for civil rights violations under 42 U.S.C. § 1983, 1985, and 1986.  To establish a claim under §1983, a plaintiff must allege (1) a deprivation of a federally protected right and (2) commission of the deprivation by one acting under the color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997).  Section 1985 claims provide redress for private conspiracies to discriminate on the basis of race. *Lake v. Arnold*, 112 F.3d at 685.  42 U.S.C. § 1986 will hold a person liable if he knows of a conspiracy to violate a plaintiff's civil rights in violation of Section 1985, has the power to prevent the violation, and fails to do so.  *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).

Plaintiff has failed to produce evidence sufficient to demonstrate that the Defendants violated a First, Fourth, Fifth, or Fourteenth Amendment right.  (*See* Complaint at Count 2.)  There is no evidence that the Defendants violated Plaintiff's rights to be free of unreasonable searches or seizures due to her consent and/or the reasonableness of the intrusions.  There is no evidence to support Plaintiff's subjective belief that animus towards her race or religion motivated the determinations about her mental state or any other act.

Section 1985 claims apply only to federal agents, not municipal officers. *Santiago v. City of Vineland*, 107 F. Supp.2d 512, 560 (D.N.J. 2000).  Moreover, in the absence of a viable Section 1983 claim, the Plaintiff cannot support her Section 1985 and 1986 claims.  *See Rhames v. Sch. Dist. of Philadelphia*, CIV.A. 01-5647, 2002 WL 1740760 (E.D. Pa. July 17, 2002).  For these reasons, Counts 2, 3, and 4 will be dismissed against the Defendants.

### 3.  *Americans with Disabilities Act*

Title II of the ADA is designed to prevent discrimination in the administration of programs, activities, and services of public entities.  *Inmates of Allegheny Cnty.*

---

[2] Arguably, qualified immunity should also apply to the Defendants who are employees of St. Clare's.  Nevertheless, the court will dismiss the civil rights claims against all the St. Clare's Defendants on the grounds that Plaintiff has not presented a prima facie case of a violation of a clearly established constitutional or statutory right.

*Jail v. Wecht*, 93 F.3d 1124, 1136 (3d Cir. 1996) (*citing* 42 U.S.C. § 12132). "To state a claim under Title II of the ADA, Plaintiff must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Getzes v. Mackereth*, 1:13-CV-2067, 2013 WL 5786000 (M.D. Pa. Oct. 28, 2013) (*citing* 42 U.S.C. § 12132). Plaintiff has not proven that she was denied the benefits of a public entity's services.

Plaintiff claims that the Defendants discriminated against her in violation of Title II of the ADA by "failing to provide her with proper police department services in investigating the conduct of her great-nephews and then chilling her rights to seek further assistance from the Morristown Police by indicating [she] should seek other redress, and even going so far as to threaten her with being taken back to Saint Clare's if she continued to make complaints against her nephews and neighbors." (Pl's Brief in Opposition to St. Clare's Defendants' Motion at 18.) This argument is not meritorious. No Defendants denied Plaintiff access to a public service.

### a. *Failure of Police to Investigate*

St. Clare's does not provide police services. More importantly, the police appropriately investigated the conduct of the nephews. The police spoke to the nephews all four times about the allegations, and there was not probable cause of any crime during any of the four investigations. The police discovered conflicting reports about the nephews' rights to stay in the upstairs apartment during the first and second investigations. Police found little evidence of a serious assault during the third investigation. Police found no evidence of stomping during the fourth investigation. Police explained to Plaintiff how to file complaints for eviction and assault. In sum, police did provide the appropriate public service to Plaintiff.

### b. *Indicating Alternative Redress*

It was the police, not St. Clare's that told Plaintiff to take her complaints about her nephews' illegal occupation of her home to the courts. More critically, telling Plaintiff to take her complaint to the court was not a deprivation of a public service – it was the appropriate action.

*c. Threatening Return to St. Clare's*

Even if Defendants had threatened to take Plaintiff back to St. Clare's, this threat does not implicate the benefits of a public service.

## IV. CONCLUSION

For the reasons elaborated above, the court **GRANTS** the Morristown Defendants' and St. Clare's Defendants' motions for summary judgment and dismisses the Complaint against those Defendants with prejudice.

/s/ William J. Martini
_____

**DATE: March 4, 2014**                **WILLIAM J. MARTINI, U.S.D.J.**